[Cite as *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521.]

IN THE COURT OF APPEALS OF MONTGOMERY COUNTY, OHIO

THE STATE OF OHIO,                                    :

      Appellant,                                    :       C.A. CASE NO. 24804

v.                                                    :       T.C. CASE NO. 11CR1551

MCLEMORE,                                             :

      Appellee.                                     :

. . . . . . . . .

O P I N I O N

Rendered on the 10th day of February, 2012.

. . . . . . . . .

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Michele D. Phipps, Assistant Prosecuting Attorney, for appellant.

Frank A. Malocu, for appellee.

. . . . . . . . .

GRADY, Presiding Judge.

{¶ 1} This appeal is brought by the state pursuant to R.C. 2945.67 and Crim.R. 12(K) from a judgment of the trial court that granted defendant, Tyler McLemore's, motion to suppress the evidence.

{¶ 2} In reviewing a trial court's decision on a motion to suppress, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible

evidence in the record. Accepting those facts as true, the court of appeals then independently determines, as a matter of law without deference to the trial court's conclusion, whether those facts satisfy the applicable legal standard. *State v. Satterwhite*, 123 Ohio App.3d 322, 704 N.E.2d 259 (2nd Dist.1997).

{¶ 3}    The facts found by the trial court in this case are as follows:

On April 30, 2011 at about 10:15 pm Amy Hisle called the Dayton Police Department. Ms. Hisle reported a domestic dispute between her and the defendant, Tyler R. McLemore. She indicated that she and McLemore were at 5939 Woodmore Drive in the City of Dayton, Montgomery County, Ohio.

On April 30, 2011 Officer Thomas Schloss was on duty as a street patrol officer for the City of Dayton Police Department. Officer Schloss was assigned at that time to the First District and he worked the 11pm-7am shift.  At that time, Officer Schloss had nine years of experience with the Dayton Police Department.

There was a Dayton Police Department dispatch at approximately 11:20 pm advising Officer Schloss of the boyfriend/girlfriend dispute at 5939 Woodmore Drive.  Officer Schloss and his partner Officer Kinstle responded to the dispatch. As they were proceeding to Woodmore Drive they received another dispatch that indicated the complaining witness, Amy Hisle, was located at an address on Leonhard Street in the Old North Dayton neighborhood. Officers Schloss and Kinstle went to the Leonhard Street address to talk to Amy

Hisle.

At 1903 Leonhard Street the Officers met with Amy Hisle. Hisle indicated to them that she had been in an argument with defendant and that the defendant had put a gun to her head. The officers learned that defendant had utilized a handgun and a rifle. It was also indicated that Amy Hisle and defendant are the parents of a child in common.

Amy Hisle did provide the Police Officers with defendant's cell phone number. She did not tell the Officer that anyone other than Defendant was at 5939 Woodmore Drive, although she did indicate that the residence belonged to Defendant's parents.

After talking with Ms. Hisle, Officers Schloss and Kinstle proceeded to Woodmore Drive. Upon arrival at 5939 Woodmore Drive the officers were joined by two other Dayton Police Officers. All the Officers were very concerned with defendant's possession of a firearm or firearms. So, the Officers spread out around the house.

Officer Kinstle, utilizing information he received from Amy Hisle, placed a cellular telephone call to defendant. Defendant answered the call and spoke with Officer Kinstle. Shortly after the conversation, defendant exited the residence and was taken into custody by the Police. Defendant was secured, but momentarily remained outside. He was relatively cooperative and did not act in an excited or agitated manner at that time.

One of the Officers stayed with defendant while the other three

Officers entered the residence. The Officers were in the residence for purposes of a "protective sweep." They asserted that they were concerned about a potential that others may be in the residence. These other individuals could potentially be injured, or could pose a threat to them (Officers) as they detained defendant and took him away. There was no testimony that the Officers had received information about other individuals being in the house. There was no testimony that they asked defendant if anyone else was in the house and he indicated that there was. There is no indication that they saw anyone moving around in the house or heard any noise before defendant came out or while they were securing him. There was no evidence that they knocked on the door and called out loudly seeking a response from anyone inside.

The Officers conducted a search of the house looking for other human beings. They did not make an extensive search such as looking in drawers, but they did look in corners and closets to see if any other people were there. No one was found in the house.

While the officers were in the house they did see an open box of shotgun shells on a chair in the house. They saw the gun cabinet and noticed that one firearm was missing.

After completing the "protective sweep" of the house one of the Officers, Officer Schloss, advised the defendant of his Miranda Rights. The defendant was secured in the back of a marked police cruiser. The defendant acknowledged he understood his rights and agreed to talk to

the Officer. The conversation was normal in tone. Defendant did not exhibit any outward indications of being under the influence of alcohol or drugs.

Defendant was informed of his right not have a search made of the house without a search warrant and his right to refuse to consent to a search. After being so advised, defendant asked to call his mother. Defendant talked to his mother by cell phone about the police request to search the house. After talking to his mother, defendant consented to the search of the premises. Defendant said he would sign the Consent to Search Form memorializing his decision to consent to the search.

After receiving defendant's permission, the Officers engaged in a comprehensive search of 5939 Woodmore Drive. They found a firearm under a cushion for a chair or couch.

{¶ 4} Defendant was indicted on one count of felonious assault, R.C. 2903.11(A)(2), one count of kidnapping, R.C. 2905.01(A)(3), and two counts of domestic violence, R.C. 2919.25(A). Defendant filed a motion to suppress all evidence obtained by police, including a gun, ammunition, and defendant's statements to police.

{¶ 5} Following a hearing held on August 29, 2011, at which only Dayton Police Officer Thomas Schloss testified, the trial court granted defendant's motion to suppress on August 31, 2011. The court concluded that police lacked a reasonable suspicion that an emergency situation existed in this case, when someone inside the residence was in need of immediate aid or when another person who remained inside the residence after defendant's arrest posed a danger to the officers or others, that would justify a warrantless emergency entry

into and a protective sweep of defendant's residence. Accordingly, the court held that the physical evidence seen by officers during the protective sweep and defendant's subsequent statements about those items, which were later seized following defendant's consent to search, were the fruit of an illegal warrantless entry and search of defendant's home that violated defendant's Fourth Amendment rights, and therefore those items were inadmissible and must be suppressed.

{¶ 6}   The state timely appealed to this court from the trial court's decision granting defendant's motion to suppress the evidence.

FIRST ASSIGNMENT OF ERROR

{¶ 7}   "The trial court improperly sustained McLemore's motion to suppress, holding that the police violated the Fourth Amendment when they conducted a 'protective sweep' of McLemore's residence."

{¶ 8}   The state relies on *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), to argue that the trial court erred when it found the protective sweep was illegal. The state argues that on the facts of this case, police had reasonable grounds to suspect that following defendant's arrest, other persons who were armed and posed a threat to the safety of the officers or others might still be in the residence.

{¶ 9}   Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to only a few well-established exceptions. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 16 (2nd Dist.). One of those exceptions is the rule regarding "protective sweeps" announced in *Buie*, a corollary of the exigent- or emergency-circumstances exception. *See also State v. Sharpe*, 174 Ohio App.3d 498,

2008-Ohio-267, 882 N.E.2d 960 (2nd Dist.). Police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches. *Welsh v. Wisconsin*, 466 U.S. 740, 749-750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In *Sharpe*, ¶ 32-37, we discussed *Buie* as follows:

> In *Maryland v. Buie,* 494 U.S. 325, two men, one of whom wore a red running suit, committed an armed robbery of a pizza restaurant. That same day, police obtained arrest warrants for two suspects, Jerome Buie and Lloyd Allen. Buie's house was placed under surveillance. Two days later, believing that Buie was inside his home, police entered to arrest him. In an attempt to find Buie, one of the officers first secured access to the basement and then twice shouted out into the basement, ordering anyone down there to come out. A male voice called back in reply. Eventually, a pair of hands was seen at the bottom of the stairwell, and Buie came up the stairs and was arrested. Thereafter, another officer entered the basement "in case someone else" was down there. When he did, the officer found a red running suit in plain view, connecting Buie to the armed robbery.

> Buie moved to suppress evidence of the red running suit police had seized. A Maryland court of appeals held that the trial court erred when it denied Buie's motion. On review, the Supreme Court reversed the state court, holding that the warrantless entry into Buie's basement was not unreasonable.

> The Supreme Court emphasized that per *Payton v. New York*

(1980), 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639, the warrant for his arrest authorized police to enter Buie's residence in order to find and arrest him, and to search the premises for him until he was found. However, that authority terminated when Buie was arrested. The court rejected Buie's argument that probable cause was required for police to then enter the basement as they did. Drawing an analogy to *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201, which likewise rejected a probable-cause standard when there is a "need for law enforcement officers to protect themselves [against] violence in situations where they may lack probable cause for an arrest," *Terry,* 392 U.S. at 24, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court in *Buie* found a similar "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested, is not harboring other persons who are dangerous and who would unexpectedly launch an attack." 494 U.S. at 333, 110 S.Ct. 1093, 108 L.Ed.2d 276.

The Supreme Court also pointed out in *Buie* that in contrast to the investigative detentions in *Terry* and *Long,* "[a] protective sweep * * * occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime," id., being thus comparable to a search incident to an arrest. Further, "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" Id.

Nevertheless, returning to the requirements for a search in *Terry* and *Long,* the Supreme Court wrote:

"We agree with the State, as did the court below, that a warrant was not required. We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long,* and as in those cases, we think this balance is the proper one." 494 U.S. at 334.

By adopting the "reasonable and articulable suspicion" standard of *Terry* and *Long,* the Supreme Court in *Buie* imposed a circumstantial predicate on the authority conferred on law enforcement officers to conduct a protective sweep of a defendant's residence following his arrest. There must be articulable facts from which police reasonably suspect that the premises in which the defendant is arrested harbors another person or persons who may launch an attack on the officers who are there. Absent that basis to act, a protective sweep is an unreasonable search for purposes of the Fourth Amendment, and any incriminating

evidence it produces must be suppressed. *Buie,* 494 U.S. at 327.

{¶ 10} We further stated in *Sharpe* at ¶ 44, 46:

The protective-sweep exception established in *Buie* is grounded on the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." 494 U.S. at 333. Once arrested, the subject poses no risk. The fact that a gun or other weapon is on the premises could give other persons an instrument to use in such an attack. But the gun or other weapon poses no danger to officers absent a person or persons who might use it to launch an attack.

\* \* \*

The protective-sweep exception to the warrant requirement in *Buie* and *Lyons* requires some positive indication that another person or persons remain in the residential premises where a subject is arrested and that they pose a threat to the safety of officers or others. Lacking that indication, there is not a need to act sufficient to avoid the requirement of a prior warrant if the house is to be searched after a defendant's arrest there. Mere suspicion that a weapon remains inside is insufficient. Likewise, not knowing whether anyone else is there is an insufficient pretext because the need for protection necessarily implies that another person or persons are there. Faced with such doubts, and absent any reason to believe that other persons may be inside, officers must obtain a

warrant before they conduct a search of a defendant's house after a defendant's arrest there.

{¶ 11} No perpetrators other than defendant were implicated in the domestic-violence incident for which defendant was arrested. When defendant came out of the residence at 5939 Woodmore Drive and was taken into custody by police, there was no suggestion either that another person or persons remained inside that residence or that the person posed a threat to the safety of the officers or others. Officers had no reason to believe that the victim of the domestic-violence offense, Amy Hisle, remained inside, because the officers had previously interviewed Hisle at another location and knew she was safe. Officers did not receive any information from Amy Hisle that any other persons were inside the residence. To the contrary, Hisle told police that defendant was watching the house for his parents who were out of town.

{¶ 12} Upon arrival, four police officers surrounded the house, and they did not see anyone or hear any voices coming from inside the home. The officers never asked defendant if anyone else was inside the home, and they did not knock on the door or call out to inquire about any other person's presence. After defendant exited the home and was taken into police custody outside the home, he no longer had access to any weapons or evidence inside the residence and posed no threat to the officers or anyone else.

{¶ 13} The state argues that because nearly two hours had passed between the victim's initial call to police and the officers' arrival at 5939 Woodmore Drive, police had no idea who might have entered the residence during that time. Not knowing whether anyone else was inside the residence is an insufficient pretext for a protective sweep to learn whether anyone is, in fact, inside. *Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960. Furthermore, mere suspicion that a weapon remains inside is insufficient. *Id*. The weapon itself posed no threat,

absent someone who might use it. Faced with such doubts, and absent any reason to believe that other persons may be inside, officers must obtain a warrant before they conduct a search of defendant's home after his arrest there. *Id.*

{¶ 14} We agree that on this record, the officers lacked a reasonable, articulable suspicion that following defendant's arrest, other persons who might pose a danger to the officers remained inside the residence. The protective-sweep exception to the Fourth Amendment's warrant requirement has not been established. Therefore, the warrantless protective sweep of this residence conducted by police violated defendant's Fourth Amendment rights.

{¶ 15} To the extent that the state also relies upon the exigent- or emergency-circumstances exception to the Fourth Amendment's warrant requirement, we stated in *Sharpe*, at ¶ 48, that the exception

> justifies a warrantless entry in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when someone inside poses a danger to the police officer's safety. *Mincey v. Arizona* (1978), 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290; *United States v. McConney* (C.A.9, 1984), 728 F.2d 1195; *State v. Price* (1999), 134 Ohio App.3d 464, 731 N.E.2d 280; *State v. Applegate* (1994), 68 Ohio St.3d 348, 626 N.E.2d 942; *State v. Overholser* (July 25, 1997), Clark App. No. 96CA0073, 1997 WL 451473; *State v. Sladeck* (1998), 132 Ohio App.3d 86, 724 N.E.2d 488.

{¶ 16} Police had no reasonable basis to suspect that anyone in need of their aid was

inside the residence after defendant came outside and was arrested by police. Police knew that the sole victim was not at that location and was safe. That they did not know whether anyone else was inside is insufficient to justify their entry. *Sharpe*. Their concern that another person might be inside who needed aid is wholly speculative on these facts and presented no emergency justifying their warrantless entry into the residence. *Id*. For the same reasons we concluded that the protective-sweep exception has not been established in this case, neither has the exigent- or emergency-circumstances exception been established. The warrantless protective-sweep search of this residence by police violated defendant's Fourth Amendment rights.

{¶ 17} The state's first assignment of error is overruled.

SECOND ASSIGNMENT OF ERROR

{¶ 18} "The trial court improperly suppressed McLemore's statements and the evidence recovered during the search of the residence after McLemore signed the consent to search as fruit of the poisonous tree."

{¶ 19} The trial court suppressed evidence of defendant's statement in response to police questioning that the shotgun police subsequently seized was under the cushions of a couch. The court reasoned that because officers gained the knowledge that prompted their questions from their observation during the protective sweep that a rifle or shotgun was missing from a gun cabinet, defendant's statement derived from the illegal protective sweep and must be suppressed as fruit of the poisonous tree.

{¶ 20} The derivative-evidence rule, or fruit-of-the-poisonous-tree doctrine as it is widely known, requires suppression of evidence that was seized in a seemingly lawful manner

but about which police learned because of a prior constitutional violation such as an illegal search or seizure. *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Sharpe*; *State v. Myers*, 119 Ohio App.3d 376, 695 N.E.2d 327 (2nd Dist.1997). The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence that is subsequently discovered and derivative of that prior illegality. *Id.*; *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

{¶ 21} The state argues that the trial court erred when it suppressed defendant's statement that the shotgun was under the cushions of a couch on a finding that the statement was the product of the illegal protective sweep and therefore barred by the derivative-evidence rule. The state points out that because defendant was under arrest for domestic violence when he made the statement in response to police questioning, defendant's statement was therefore not evidence derivative of the protective sweep.

{¶ 22} The state's argument relies on the independent-source exception to the derivative-evidence rule. The exception provides that if knowledge of the derivative evidence is gained from an independent source, rather than from the government's own illegality, the derivative evidence may be used. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed.319 (1920).

{¶ 23} When defendant made the incriminating statement concerning the location of the shotgun, he was under arrest on a charge of domestic violence and had been Mirandized. Prior to their arrival at defendant's place of residence, where the domestic-violence offense occurred, police had interviewed the complainant, Amy Hisle. The trial court found that in interviewing Hisle, officers "learned that defendant had utilized a handgun and a rifle." Hisle's statement was a source of knowledge for the question police asked defendant that was

independent of the illegal protective sweep. Therefore, defendant's statement made in response to that question is not subject to suppression under the derivative-evidence rule.

{¶ 24} The state further argues that the second, subsequent warrantless entry into defendant's residence made by the officers, and their seizure of the shotgun, was authorized by the consent to search given by defendant, and suppression of that evidence is therefore not required by the prior illegal warrantless search.

> Consent is not an exception to the warrant requirement fashioned out of exigent circumstances, but a decision by a citizen not to assert Fourth Amendment rights. At issue are: (1) the test of voluntariness, (2) whether the individual consenting may place limitations upon the search, and (3) who is authorized to consent. The burden of proving consent is on the prosecution. Whether a consent to a search is voluntary or the product of duress or coercion is a question of fact to be determined from the totality of the circumstances. The state must show by clear and convincing evidence that the consent was freely and voluntarily given which is more than a mere preponderance but less a certainty than is required to prove guilt beyond a reasonable doubt. Consent may be oral or written. A written consent is strong evidence of a defendant's willingness to allow a search.

Katz, *Ohio Arrest, Search and Seizure*, Section 19:1 (2008).

{¶ 25} The record does not indicate that defendant was not authorized to consent to the search officers performed when they entered his residence and seized the shotgun or that in doing so officers exceeded any limits the consent imposed. The question, then, is whether

defendant's consent was voluntarily given.

**{¶ 26}** In *State v. LaPrairie*, Greene No. 2010CA0009, 2011-Ohio-2184, we wrote:

> We have held that even when a consent is not the product of some more specific coercion or duress, and therefore was voluntary in the usual sense, evidence seized in a search performed after the consent was given remains subject to suppression when it was tainted by the fact of a prior illegal entry upon the premises that were searched. *Dayton v. Lowe* (Dec. 31, 1997), Montgomery App. No. 16458. "The question is whether the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" *State v. McGuire,* Montgomery App. No. 24106, 2010–Ohio–6105, ¶ 22, quoting *State v. Cooper,* Montgomery App. No. 20845, 2005–Ohio–5781, ¶ 28. "'[S]uppression is required of any items seized during the search of the house, unless the taint of the initial entry has been dissipated before the consents to search were given'; dissipation of the taint resulting from the illegal entry 'ordinarily involves some showing that there was some significant intervening time, space, or event.'" *United States v. Buchanan* (C.A.6, 1990), 904 F.2d 349, 356, quoting *United States v. Vasquez* (C.A.2, 1980), 638 F.2d 507–527–529, cert. denied, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981).

**{¶ 27}** Defendant was under arrest when he signed the consent form, but the fact of arrest does not necessarily render consent involuntary. The question becomes whether the duress present in a particular case exceeds the normal duress inherent in any arrest. *State v.*

*Simmons*, 61 Ohio App.3d 514, 573 N.E.2d 165 (9th Dist. 1989).

{¶ 28} Officer Schloss testified that after defendant said that the shotgun was under the couch cushions, he presented defendant with a consent-to-search form, which he read aloud to defendant. The form states that the signor has "been informed of my constitutional right not to have a search made of the premises." Defendant said that he understood the form but had some initial reservations because the house belonged to his parents, who were out of town, and he was house-sitting. Defendant asked to first speak with his mother by cell phone and did so for approximately five to seven minutes. After concluding the conversation, defendant said he was ready to sign, and did sign, the consent form.

{¶ 29} The trial court's findings of fact are wholly consistent with the testimony of Officer Schloss. The court concluded: "Based on all the evidence, the court concludes that the defendant knowingly and voluntarily * * * granted permission to search the residence." The court nevertheless suppressed the evidence officers seized in the course of the consensual search, finding that the prior and illegal protective sweep required suppression of that evidence under the fruit-of-the-poisonous-tree doctrine.

{¶ 30} The fruit-of-the-poisonous-tree doctrine, or derivative-evidence rule, applies when a Fourth Amendment or other constitutional violation has occurred. The trial court correctly found that the protective sweep presented a Fourth Amendment violation. However, the court also found that defendant's subsequent consent was voluntary. That voluntary consent was a decision by defendant to not assert his Fourth Amendment rights with respect to the search and seizure to which he consented. Having done so, defendant waived his right to invoke Crim.R. 12(C)(3) to ask the court to suppress the evidence seized in the course of the consensual search on a claim that the evidence the officers seized was tainted by the prior

protective sweep and the violation of defendant's Fourth Amendment rights that sweep involved.

{¶ 31} The second assignment of error is sustained. The trial court's order suppressing evidence of defendant's statement and the shotgun police seized is reversed. The case is remanded to the trial court for further proceedings     consistent with this opinion.

Judgment reversed

and cause reversed.


DONOVAN and HALL, JJ., concur.