[Cite as *State v. Rodriguez*, 2013-Ohio-491.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 98422**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JOSE O. RODRIGUEZ

DEFENDANT-APPELLANT

---

## JUDGMENT:
## REVERSED, VACATED, AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-549976

**BEFORE:** S. Gallagher, J., Stewart, A.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** February 14, 2013

**ATTORNEY FOR APPELLANT**

Michael J. Cheselka, Jr.
Michael J. Cheselka, Jr., LLC
75 Public Square, Suite 920
Cleveland, OH   44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Marc D. Bullard
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113

SEAN C. GALLAGHER, J.:

{¶1} Appellant, Jose O. Rodriguez, appeals from his conviction and sentence in the Cuyahoga County Court of Common Pleas. For the reasons stated herein, we reverse the judgment of the trial court, vacate appellant's convictions and sentence, and remand the matter for further proceedings consistent with this opinion.

{¶2} On May 20, 2011, appellant was charged under an eight-count indictment with three counts of trafficking, three counts of drug possession, one count of tampering with evidence, and one count of possessing criminal tools, all with accompanying specifications. Appellant entered a plea of not guilty to the indictment. Thereafter, he filed a motion to suppress evidence based upon an illegal search and seizure and warrantless entry.

{¶3} At the suppression hearing, testimony was presented that reflected the following. On May 3, 2011, members of the Northern Ohio Violent Fugitive Task Force were looking for a federal escapee, Juan Colon, who had cut off his ankle bracelet and left his residence. The state represented that "the marshals then did issue a memorandum, which gave the [U.S. Marshals Service] the authority to go looking for the escaped federal prisoner." During their investigation, they came upon a possible location for Colon at 3360 Seymour Avenue in Cleveland. There was testimony that the marshals "had a tip that [Colon] was possibly at that residence." At least eight members of the task force went to this location.

{¶4} As task-force officers knocked on the front door and announced "police," Deputy U.S. Marshal Ryan Helfrich observed a male run down the stairs, cross in front of the window, and run back upstairs. Within minutes, Dep. Helfrich heard over the radio that a window had opened and closed, which was a concern that the person they were looking for might jump out a window.

{¶5} A Hispanic woman, Carmen Ruiz, answered the door. Dep. Helfrich testified that the marshals were granted permission to enter the home; however, he did not hear the woman speak and did not know whether she spoke English. He indicated that he did not believe anyone present on the task force spoke Spanish.

{¶6} During a search of the home, an odor of marijuana was detected in the basement. In the basement was a stack of tires, which was approximately four feet tall, where the odor of marijuana was stronger. Upon looking into the tires to see if anyone was hiding in them, task force members observed an open shopping bag containing plastic bags of marijuana. Appellant, Ruiz, Meraly Rodriguez, who is Colon's ex-girlfriend, and appellant's girlfriend were at the home on this date.

{¶7} Another member of the task force, Tyshawn Irby, testified that he was covering the front of the house as other members of the task force were preparing to knock on the door. He heard an upstairs window of the subject house open, and when he yelled "hey," he heard the window close. A few minutes later, a gentleman tried to come out of a neighboring house, and Irby asked him to go back inside until the area was secure. After the house was secured, the neighbor came back outside and pointed to a

bag that contained cocaine, which was in the yard near the area of the window. The neighbor's home was very close to the subject home, and the neighbor was not questioned about the drugs.

{¶8} Cleveland Police Detective Joseph Dimuzio responded to the location to assist with the investigation. Upon arriving, Det. Dimuzio was briefed by Cleveland Police Lieutenant Petkac. Det. Dimuzio was advised that appellant, after being Mirandized, had admitted the drugs in the house were his. Det. Dimuzio testified that he approached appellant, who was in custody in a police vehicle. He stated that he Mirandized appellant and appellant indicated he wished to answer some questions. Det. Dimuzio indicated that appellant admitted the bag of cocaine found outside the house was his and that he had thrown it out the window. Det. Dimuzio admitted that appellant's statement was made after being told the police could arrest everyone in the house.

{¶9} After obtaining a search warrant, Det. Dimuzio returned to the scene and performed a detailed search of the home. As a result of this search, additional contraband, drug paraphernelia, and $260 in U.S. currency were found in the home. Det. Dimuzio testified that after appellant was taken to the police station, he was again read his *Miranda* rights. Det. Dimuzio stated that appellant initially exhibited a willingness to participate in the investigation, but then indicated he did not desire to speak anymore. No statement was ever signed by appellant to indicate he waived his *Miranda* rights.

{¶10} Cleveland Police Detective Michael Alexander testified that after appellant was given his *Miranda* rights, appellant admitted that he had thrown the drugs out of the

window and that the marijuana inside of the house was his. Det. Alexander admitted that he did not make a report of these statements.

{¶11} Carmen Ruiz was questioned with the use of an interpreter after expressing that she understood little English. She testified that Miraly Rodriguez and appellant, who are her daughter and son, lived with her at 3360 Seymour Avenue in Cleveland. She provided the following testimony as to what transpired at her door on May 3, 2011:

> Q. Now I'm going to call your attention to I believe it was May 3rd, when Jose was arrested. Now, did anything unusual happen that day?
> A. [The police] went to look for somebody.
> Q. Did somebody knock on the door?
> A. Yes.
> Q. And when they knocked, did they talk to someone?
> A. With Jose.
> Q. Did they talk with you?
> A. No. [Ruiz] opened the door, it was two doors, she opened the first door. And he — she didn't understand, so he spoke to Jose in the second door.
> Q. And so the conversation was with Jose?
> A. With Jose, but she was next to him.
> Q. Okay. Was Jose telling you what was going on during this point in time?
> A. Yes. Jose was saying to him that that person they were looking for did not live there.
> Q. Did you know that person?
> A. Yes.
> Q. And his name was Juan Colon, correct?
> A. Yes.
> Q. Do you know Juan Colon?
> A. Yes.
> Q. Who is it?
> A. Was the boyfriend of her daughter.
> Q. Did — how did the police get into your house?
> A. They knocked on the windows and the door and she looked. She told Jose the police is here, but she didn't know what was going on, until the police said they were looking for Juan Colon, that they thought he lived there, but he doesn't live there.

Q.     Did you ever give them permission, yourself, to come into your home?

A.     No.  She never gave them permission that — they were talking to Jose, and they just were entering.

Q.     When you say they just were entering, I don't understand that. What do you mean by that?

A.     She says that they were just kind of walking into the house, speaking to Jose.  They just kind of kept talking and walking into the house.

Q.     Did there come a time that the police said something to you?

A.     That they wanted to take her and arrest her.

Q.     Who translated this for you, or did you understand it?

A.     She only understood "mother," but the rest her daughter told her.

{¶12} Ruiz further testified as follows concerning Colon:

Q.     You stated that Juan Colon dated your daughter?

A.     They were * * * [b]oyfriends/girlfriends, yes.

Q.     Had Juan Colon been in your house on previous days?

A.     He only went two or three times for a bit and then never again.   But a long time — a long, long time ago.

Q.     How many times has he been in your house?

A.     Three times, approximately.   Around three times.

{¶13} Judy Blair, who is appellant's girlfriend, testified that the police asked appellant if he was going to make a written statement saying the drugs were his and appellant said no and asked to speak to a lawyer.   She never heard appellant get read his *Miranda* rights.

{¶14} After the suppression hearing, the trial court denied the motion to suppress. The matter proceeded to trial; however, following jury selection, appellant informed the court that he wished to enter a plea of no contest.

{¶15} Thereafter, appellant entered a plea of no contest to all eight charges of the indictment, and the trial court entered a finding of guilt on said charges with accompanying specifications.   Following merger of allied offenses, the trial court

imposed a total prison term of three years plus five years of mandatory postrelease control.

{¶16} Appellant timely filed this appeal, raising two assignments of error for our review. His first assignment of error provides as follows:

The trial court erred in its denial of appellant's motion to suppress and, thereby, incorrectly continued proceedings as against him and, therewith, violated his constitutional rights to a fair trial.

{¶17} In *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, the Ohio Supreme Court set forth the following review standard for a motion to suppress:

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583.

Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539.

{¶18} "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, in order to search

for the subject of an arrest warrant in the home of a third party, a search warrant must be obtained, absent exigent circumstances or consent. *Steagald v. United States*, 451 U.S. 204, 205, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

{¶19} In this case, it was represented that the U.S. Marshals had a "memorandum" that gave them the authority to go looking for Colon. Even assuming that an arrest warrant was actually issued, the state failed to establish there was a reasonable belief that Colon was within the subject residence. The only evidence presented was testimony that the U.S. Marshals "had a tip that [Colon] was possibly at that residence." Nothing was provided as to the details of the tip or to establish its reliability. Nor was it shown that any steps were taken to independently corroborate the tip. Further, Ruiz testified that Colon was not at her home. She further indicated that her daughter and Colon had been boyfriend and girlfriend, but Colon had been at her home only two or three times, a long time ago. Thus, it was never established that Colon frequented this location. Under these circumstances, the officers did not have reason to believe that Colon would be found within the home.

{¶20} Additionally, no exigent circumstances were shown to justify the entry. The prosecutor argued during the oral hearing that the cocaine found outside the residence that was pointed out by a neighbor to the police formed the basis for an entry based on exigent circumstances. We disagree. While officers claimed they heard a window open and close and the prosecution theorized that the cocaine was thrown from the window, no one actually witnessed that transpire. Dep. Helfrich testified that it

actually was a concern that the person they were looking for might jump out the window. Further, the neighbor did not point out the bag to the police until after the residence was secure. Thus, insofar as contraband was found near the window outside the home, it was not discovered until after the unlawful intrusion occurred and could not form the basis for exigent circumstances.

{¶21} Finally, there was no evidence that Ruiz consented in any manner to the officers' entry into her home. The government bears the burden of proving voluntary consent, and this burden is heavier when it appears the owner does not readily speak and understand the English language. *United States v. Hernandez*, 443 Fed.Appx. 34, 40 (6th Cir.2011), citing *Kovach v. United States*, 53 F.2d 639 (6th Cir.1931). Moreover, "'[c]onsent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion.'" *Hernandez* at 40, quoting *United States v. Williams*, 754 F.2d 672, 674-675 (6th Cir.1985). The state failed to meet its burden in this case.

{¶22} Dep. Helfrich testified that the marshals were granted permission to enter the home, yet he did not hear Ruiz speak and did not know whether she spoke English. He also indicated that he did not believe anyone present on the task force spoke Spanish. Ruiz, who speaks Spanish, testified that she did not understand the officers, she never gave them permission to enter, and the officers just walked into her home. Thus, the evidence before the trial court reflected that the search was nonconsensual.

**{¶23}** All evidence that has been illegally obtained in violation of the Fourth Amendment is barred by the Exclusionary Rule. *Mapp v. Ohio*, 367 U.S. 643, 654, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). "The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence that is subsequently discovered and derivative of that prior illegality." *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, 968 N.E.2d 612, ¶ 20 (2d Dist.). Thus,

> [t]he derivative-evidence rule, or fruit-of-the-poisonous-tree doctrine as it is widely known, requires suppression of evidence that was seized in a seemingly lawful manner but about which police learned because of a prior constitutional violation such as an illegal search or seizure. *Id.*

**{¶24}** Accordingly, we find the trial court's determination was not supported by competent, credible evidence in the record and that the evidence seized from Ruiz's home and the statements made by appellant were the result of an illegal search and seizure. Appellant's first assignment of error is sustained. The remaining assignment of error, which pertains to appellant's sentence, is moot. App.R. 12(A)(1)(c).

**{¶25}** Judgment reversed, convictions and sentence vacated, and cause remanded.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

MELODY J. STEWART, A.J., and
MARY J. BOYLE, J., CONCUR