[Cite as *State v. Barnes*, 2017-Ohio-7284.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO. 9-16-58

    v.

DEMARIO BARNES,                       O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 15-CR-0415

Judgment Affirmed

Date of Decision: August 21, 2017

APPEARANCES:

    *J.C. Ratliff and Jeff Ratliff* for Appellant

    *Kevin P. Collins* for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Demario Barnes ("Barnes"), appeals the November 17, 2016, judgment entry of sentence of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from an arrest warrant served on Barnes on September 9, 2015. On that date, several law enforcement officials traveled to Barnes's residence on Executive Drive in Marion, Ohio to arrest him for trafficking in drugs. Barnes was arrested without incident. He then requested to use the bathroom and entered his residence with law enforcement in order to do so before being transported to jail. An officer who remained at the scene entered the home without permission and without a warrant, and he spoke to Danielle Cutarelli ("Cutarelli"), who lived with Barnes, about Barnes's arrest and about the drugs that were in plain view in the apartment. Cutarelli then signed a document indicating that she consented to a search of the residence. The search that followed revealed drugs and weapons.

{¶3} On September 24, 2015, the Marion County Grand Jury indicted Barnes on one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(1), a felony of the fourth degree. (Doc. No. 1). On September 28, 2015, Barnes appeared for arraignment and pled not guilty to the count in the indictment. (Doc. No. 6). On February 11, 2016, the State filed a superseding joint indictment

charging Barnes with: Count One of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(1), a felony of the fourth degree; Count Two of possession of heroin in violation of R.C. 2925.11(A), (C)(6), a felony of the first degree; Count Three of possession of marijuana in violation of R.C. 2925.11(A), (C)(3), a felony of the third degree; Count Four of possession of cocaine in violation of R.C. 2925.11(A), (C)(4), a felony of the fifth degree; and Count Five of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1), a felony of the fifth degree. (Doc. No. 16). Counts Two, Three, Four, and Five include a forfeiture specification as to $8,396.00 in cash that is allegedly proceeds from drug activity. (*Id.*). The same counts also include forfeiture specifications as to certain weapons and ammunition used or intended for use in the commission or facilitation of the relevant offenses. (*Id.*). On February 16, 2016, Barnes appeared for arraignment and pled not guilty to the counts and specifications in the joint superseding indictment. (Doc. No. 19).

{¶4} On May 3, 2016, Barnes filed a motion to suppress evidence in which he sought the suppression of evidence gathered from the residence because, as relevant here, Curtarelli's consent to the search of the residence was involuntary and was tainted by the initial entry of law enforcement into the home. Barnes further argued in his motion to suppress evidence that the search was invalid because some of the officials involved in the search were probation officers rather than police

officers. The State filed a memorandum in opposition to Barnes's motion to suppress evidence on August 31, 2016. (Doc. No. 50). After a hearing, the trial court denied Barnes's motion to suppress evidence on September 14, 2016. (Doc. No. 52). The trial court specifically concluded that law enforcement improperly entered the residence initially, but the trial court also concluded that the taint of the initial entry was dissipated by a significant intervening event—Barnes's request to use the restroom. (*Id.*). The trial court also concluded that Cutarelli's consent was voluntary, as she appeared coherent and did not manifest any health problems until some time later when she had a seizure on the patio outside the apartment. (*Id.*). The trial court further concluded that all of those who participated in the search had the authority to do so. (*Id.*).

{¶5} On October 4, 2016, Barnes appeared for a change-of-plea hearing and pled no contest to Counts Two and Three of the superseding joint indictment with the attendant specifications pursuant to a negotiated plea agreement. (Doc. No. 62). All other counts were dismissed. (Doc. No. 78). On November 17, 2016, the trial court sentenced Barnes to five years in prison and a $10,000 fine as to Count Two, as well as 30 months in prison as to Count Three, with the prison terms to be served concurrently for a total of five years of incarceration. (*Id.*). The trial court further ordered that Barnes's interest in the property described in the specifications be

forfeited. (*Id.*). The trial court filed its judgment entry of sentence on November 17, 2016. (*Id.*).

{¶6} Barnes filed his notice of appeal on November 23, 2016. (Doc. No. 81). He brings two assignments of error for our review.

### Assignment of Error No. I

**The Trial Court Erred When It Found That A Significant Intervening Event Had Occurred That Dissipated The Taint Of The Illegal Entry Before The Written Consent to Search Was Given.**

{¶7} In his first assignment of error, Barnes argues that the trial court erred when it concluded that a significant intervening event occurred, purging the taint of law enforcement's allegedly illegal entry into Barnes's residence, which took place before the consent to search was given. Specifically, Barnes argues his request to use the bathroom at his residence was not a significant intervening event that purged the taint caused by law enforcement's initial entry into his residence. Barnes also argues that Cutarelli's consent was involuntary.

{¶8} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact

if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶9} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect individuals against unreasonable searches and seizures by the government, and they protect privacy interests where an individual has a reasonable expectation of privacy. *State v. Fielding*, 10th Dist. Franklin Nos. 13AP-654 and 13AP-655, 2014-Ohio-3105, ¶ 15, quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577 (1979). An expectation of privacy is protected where an individual has manifested a subjective expectation of privacy and that expectation is one that society recognizes as reasonable. *Id.*, citing *Smith* at 740, citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). While the Fourth Amendment does not specifically provide that unlawful searches and seizures will result in the suppression of ill-gotten evidence, the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment. *State v. Jenkins*, 3d Dist. Union No. 14-10-10, 2010-Ohio-5943, ¶ 9, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684 (1961) and *Weeks v. United States*, 232 U.S. 383, 394, 34 S.Ct. 341 (1914).

{¶10} Consent to a search waves the requirement that the State procure a warrant if that consent is freely and voluntarily given. *State v. LaPrairie*, 2d Dist. Greene No. 2010CA-0009, 2011-Ohio-2184, ¶ 50. Whether consent is voluntary or is instead the product of duress or coercion is a question of fact to be determined based on the totality of the circumstances. *Id.* Factors to be considered in determining whether consent is voluntarily given include: (1) the suspect's custodial status and the length of the detention; (2) whether consent was given in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the words and conduct of the suspect; (6) the suspect's awareness of his right to refuse consent and his status as a "newcomer to the law"; and (7) the suspect's education and intelligence. *State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 23, citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 248-249, 93 S.Ct. 2041 (1973). Consent is not rendered involuntary or coerced simply because police indicate a willingness to obtain a warrant in the event consent is withheld. *State v. Marland*, 3d Dist. Logan No. 8-16-15, 2017-Ohio-4353, ¶ 27, citing *State v. Dunwoody*, 5th Dist. Licking No. 2004CA49, 2005-Ohio-219, ¶ 19. When consent follows some form of illegal police action, the question becomes whether, "granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*LaPrairie* at ¶ 51, quoting *Wong Sun v. United* States, 371 U.S. 471, 488, 83 S.Ct. 407 (1963). Whether consent is voluntary and whether the consent is tainted by a prior illegality and thus is fruit of the poisonous tree are separate and independent analyses. *Id.* at ¶ 52.

**{¶11}** In determining whether the taint of the initial entry has been removed, we must consider the temporal proximity of the initial illegality to the consent, the presence of any intervening circumstances between the illegality and the consent, and, in particular, the purpose and flagrancy of official misconduct. *U.S. v. Delancy*, 502 F.3d 1297, 1309 (11th Cir.2007). The analysis is a fact-specific one, and no single fact is dispositive. *Id.*, citing *Brown v. Illinois*, 422 U.S. 590, 603 95 S.Ct. 2254 (1975). Though the factors enumerated above provide a useful framework, we must not allow this factor-based analysis to obscure the underlying question, which "generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." *Id.* at 1310, quoting *U.S. v. Bailey*, 691 F.2d 1009, 1013 (11th Cir.1982).

**{¶12}** The doctrine of inevitable discovery provides that tainted evidence remains admissible when evidence discovered during an initial illegal search would have been ultimately or inevitably discovered during a lawful investigation. *State v. Workman*, 3d Dist. Auglaize No. 2-15-05, 2015-Ohio-5049, ¶ 41, citing *State v. Perkins*, 18 Ohio St.3d 193, 196 (1985). The rule permits the State to remove the

taint from ill-gotten evidence by establishing that the unlawful act from which the evidence resulted was "not a sine qua non of its discovery." *State v. Foster*, 3d Dist. Allen No. 1-14-54, 2015-Ohio-3401, ¶ 9, quoting *U.S. v. Griffin*, 502 F.2d 959 (6th Cir.1974). For the exception to apply, the state must demonstrate (1) "that the police possessed the leads making the discovery inevitable at the time of the misconduct and (2) that the police were actively pursuing an alternative line of investigation prior to the misconduct." *Id.*, quoting *State v. Keith*, 178 Ohio App.3d 46, 2008-Ohio-4326, ¶ 10 (2d Dist.).

**{¶13}** A video-taped deposition in this matter took place on August 30, 2016. (Aug. 30, 2016 Depo. at 3). At that proceeding, the state called Detective David Troutman ("Troutman") of the Marion Police Department. (*Id.* at 7). Troutman testified that Cutarelli appeared to be coherent during his interactions with her—she did not appear to be under the influence of anything, and she responded appropriately to questions that were put to her. (*Id.* at 15). Troutman further testified that Cutarelli was not arrested and was never told that she would be placed under arrest. (*Id.* at 20).

**{¶14}** On cross-examination, Troutman averred that Cutarelli was told that she had the right to refuse consent to the search, was never placed in custody, and was never read her *Miranda* rights. (*Id.* at 63). Troutman also testified that none of the officers drew a firearm. (*Id.* at 64). Troutman stated that, during the course of

talking to Cutarelli, he expressed a willingness to contact a judge to seek a search warrant for the premises if Cutarelli did not consent to the search of the residence. (*Id.* at 73). Troutman also testified that the conversation between himself and Cutarelli was a "pretty cordial" one and that Cutarelli "didn't balk at" his request for consent to search; Troutman said consent was "really not an issue with her." (*Id.* at 73); (*Id.* at 80). Troutman testified that Cutarelli was "very compliant." (*Id.* at 80).

{¶15} On re-direct examination, Troutman testified that Cutarelli never requested that law enforcement leave the residence. (*Id.*). Troutman further asserted that he read the consent-to-search form to Cutarelli. (*Id.* at 84). This form, signed by Cutarelli, attests to the fact that she gave the permission "freely and voluntarily, without any threats or promises having been made." (Defendant's Ex. B). It further informs Cutarelli of the fact that she has the right to refuse consent. (*Id.*). Troutman testified that Cutarelli seemed to understand the consent form. (Aug. 30, 2016 Tr. at 84). He asserted that Cutarelli asked no questions about the document. (*Id.*). Troutman testified that at no point during his conversation with Cutarelli did she indicate that she did not understand what was happening. (*Id.* at 86). Troutman asserted that he never threatened or yelled at Cutarelli, nor did he see any other officers do so. (*Id.* at 86).

{¶16} At the hearing on Barnes's motion to suppress evidence on September 1, 2016, the State called Special Agent Matthew Komar ("Komar") of the FBI, who assisted in the execution of the warrant on September 9, 2015. (Sept. 1, 2016 Tr. at 7-8). On direct examination, Komar testified that Cutarelli "seemed fine" as Troutman spoke with her. (*Id.* at 12). He testified that Cutarelli was responsive to questions and that she did not appear to have any difficulty understanding what Troutman said to her. (*Id.*). Komar testified that Cutarelli was never arrested, never in custody, and was never handcuffed. (*Id.* at 27-28). He further asserted that law enforcement never drew their firearms. (*Id.* at 28).[1]

{¶17} The State next called Marion County Adult Probation Officer Nate George ("George"). (*Id.* at 48). On direct examination, George testified that Cutarelli was responsive to the questions that Troutman asked her. (*Id.* at 54). George further averred that, to his knowledge, Cutarelli did not indicate being ill. (*Id.*). He testified that Cutarelli appeared coherent and that no one screamed at, threatened, or handcuffed her. (*Id.* at 54-55).

{¶18} On cross-examination, George testified that he never heard anyone read Cutarelli her *Miranda* rights. (*Id.* at 64). George asserted that the length of

---

[1] Komar testified that law enforcement drew their weapons as they conducted a protective sweep of the apartment, particularly of the upstairs portion of the apartment. (Sept. 1, 2016 Tr. at 32). However, we presume that he meant no law enforcement drew their firearms in Cutarelli's presence.

time between Barnes's arrest and Cutarelli's signing of the consent form was approximately ten minutes. (*Id.* at 70).

{¶19} On re-direct examination, George testified that he did not recall hearing Cutarelli ask anyone to leave the residence. (*Id.* at 75).

{¶20} The State next called Detective Scott Sterling ("Sterling") of the Marion City Police Department. (*Id.* at 96). On direct examination, Sterling testified that he did not believe Cutarelli was ever in handcuffs and that he did not see anyone yell at or threaten her. (*Id.* at 99). Sterling further testified that Cutarelli never instructed officers to leave the residence. (*Id.* at 100).

{¶21} The State also called Lieutenant Mark Elliot ("Elliot") of the Marion City Police Department, who testified that he spoke to Cutarelli and that she was coherent when he did so. (*Id.* at 121, 125).

{¶22} The State then called Chief Probation Officer Jennifer Miller ("Miller") of the Marion County Adult Probation Department. (*Id.* at 153). On direct examination, Miller testified that the length of time between the entry into the residence and the search was approximately five to ten minutes. (*Id.* at 156). Miller averred that Cutarelli never refused consent and never instructed those conducting the search to leave the residence. (*Id.* at 157).

{¶23} We conclude that the trial court did not err by denying Barnes's motion to suppress evidence because the trial court's conclusion that Cutarelli's consent

was voluntary is supported by competent and credible evidence. We begin our analysis by noting that written consent is strong evidence of one's willingness to allow a search. *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, ¶ 24 (2d Dist.). We further note that the record reveals that Cutarelli never testified that her consent was in any sense coerced, and this too weighs in favor of concluding that her consent was voluntary. *State v. Camp*, 5th Dist. Richland No. 14CA42, 2014-Ohio-329, ¶ 25.

{¶24} In *State v. Clements*, the Fourth District Court of Appeals confronted a set of facts in which law enforcement had entered the residence of the defendant suspecting that he was engaged in the manufacture of drugs. 4th Dist. Hocking No. 15CA19, 2016-Ohio-3201, ¶ 7-8. Though the defendant was not present when law enforcement arrived and entered the residence, he soon arrived. *Id.* at ¶ 11. Law enforcement testified that they made clear to him that he was free to leave and was not in custody or under arrest. *Id.* Law enforcement testified that Clements signed a consent form allowing them to conduct a search of his residence, though that form was eventually lost and so was not introduced into evidence at the suppression hearing. *Id.* at ¶ 11-12. Law enforcement further testified that they did not observe anything leading them to believe that Clements had difficulty understanding what it meant to consent to a search or that Clements had any physical or mental malady that rendered him less competent than any other member of the public. *Id.* at ¶ 12.

-13-

Law enforcement also testified that they did not specifically inform Clements of his right to refuse consent. *Id.* The court in *Clements* concluded that the trial court's finding that Clements consented voluntarily was based on competent and credible evidence. *Id.* at ¶ 2.

{¶25} Similar facts are now before us. Agent Komar at the scene, as well as multiple law enforcement and probation officers, testified that Cutarelli was cooperative and compliant in her dealings with them. *State v. Dean*, 12th Dist. Fayette No. CA2013-03-007, 2014-Ohio-448, ¶ 14 (noting that a willingness to cooperate and speak with law enforcement weighs in favor of a finding of voluntariness). *See also State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 25 (noting that "polite and courteous" interactions between law enforcement and one who consents supports a finding of voluntariness). The testimony uniformly indicated that no law enforcement officials threatened or yelled at Cutarelli. *Fry* at ¶ 25. Moreover, testimony indicated that Cutarelli was never threatened with arrest or put in custody, nor did she ever indicate a desire to have officers leave her home during the approximately ten minutes prior to her consent or at any time thereafter. *Id.* Testimony also established that the consent was given at Cutarelli's residence and not at a police station. Multiple witnesses further testified that Cutarelli did not manifest any mental or physical difficulties and demonstrated no lack of education or intelligence that would cast doubt on her

ability to understand events as they unfolded. *Clements* at ¶ 12. The written consent form Cutarelli signed is part of the record before us, and it specifically informed Cutarelli that she had the right to refuse consent. *McLemore* at ¶ 24; (*See* Defendant's Ex. B). Troutman testified that Cutarelli had prior interactions with law enforcement, including prior drug offenses. (Aug. 30, 2016 Depo. at 83). This suggests that she was not a "newcomer to the law." *State v. Stepp*, 4th Dist. Scioto, No. 09CA3328, 2010-Ohio-3540, ¶ 24 (holding that evidence suggesting prior offenses precludes one from being a "newcomer to the law"). Therefore, the trial court's conclusion that Cutarelli's consent was voluntary is based on competent and credible evidence. *Clements* at ¶ 2.

{¶26} Second, the trial court's conclusion that the taint of the initial entry was dissipated is supported by competent and credible evidence. *U.S. v. Delancy*, 502 F.3d 1297, 1313-1314 (11th Cir.2007). In *DeLancy*, the Eleventh Circuit Court of Appeals confronted a set of circumstances in which police entered and searched a residence, having been given consent to do so by the defendant's girlfriend Godfrey, who shared the residence with him. *Id.* at 1301-1302. The police in *DeLancy* conducted an illegal protective sweep of the residence. *Id.* at 1308. In concluding that the taint of the illegal search had dissipated by the time consent was rendered, the court in *DeLancy* found that a "relatively brief period" of ten to fifteen minutes between the illegal search and the consent weighed in favor of finding that

the taint of the illegal search had dissipated.  *Id.* at 1310-1311.  The court explained that the brief period of time weighed in favor of dissipation because the woman who gave consent "was not handcuffed or detained" and because "the district court found that the interaction was conversational in tone, and that the officers did not threaten [the defendant's girlfriend] in any way."  *Id.* at 1311.  The court in *DeLancy* also concluded that an intervening circumstance weighed in favor of finding dissipation of the taint.  *Id.*  Specifically, the court held Godfrey's review and signing of a consent-to-search form to be an important intervening circumstance because the form notified Godfrey of her constitutional rights.  *Id.*  In considering the purpose and flagrancy of government conduct, the court found that this factor too weighed in favor of finding that the consent was attenuated from the initial illegal search.  *Id.* at 1312.  The court explained that, though the police in *DeLancy* entered illegally, they did not do so for an illegal purpose.  *Id.*  That is, the police entered to ensure their own safety and interview Delancy, not to conduct a thorough search of the home.  *Id.*  In examining whether government misconduct was flagrant, the court found that this factor also weighed in favor of finding that the taint of the illegal entry dissipated, as police never handcuffed Godfrey, never pointed their weapons at her, and that they conducted a limited protective sweep once inside the home.  *Id.* at 1312-1313.

**{¶27}** Similar facts exist here. A relatively brief period of approximately ten minutes separated the entry from Cutarelli's signing the consent form. *Id.* at 1311. The trial court credited extensive testimony that, during that time, Cutarelli was coherent and able to make decisions, and officers did not handcuff, threaten, or coerce Cutarelli. *Id.* (noting that a brief period of time between an illegality and consent can weigh in favor of dissipation of the taint where the individual who consented had conversational and non-threatening interactions with law enforcement during that time). Cutarelli also reviewed and signed a consent form that informed her of her constitutional rights, attested to the fact that she consented voluntarily, and made clear that she had the right to refuse consent. *Id.* (noting that the review and signing of a consent form is an important intervening circumstance because it ensures that an individual is aware of his or her rights). The record also reveals that, as in *DeLancy*, the initial entry by police was not for an unlawful purpose. *Id.* at 1312 (describing the difference between an unlawful entry and an entry for an unlawful purpose as "critical"). Troutman entered only so that he would not have to yell across the apartment to Cutarelli in order to be heard. *Id.* The police misconduct in this case, if any, was certainly not flagrant, as the record indicates that police conducted themselves professionally once they entered the home, never threatening or handcuffing Cutarelli and never drawing their weapons on her. *Id.* at 1313.

{¶28} Therefore, the trial court's conclusion that any illegality arising from the initial entry was dissipated by the time Cutarelli consented to the search of the residence is supported by competent and credible evidence.

{¶29} Even if we were to determine that the trial court's conclusions that Cutarelli's consent was voluntary and was attenuated from the initial entry by police are not supported by competent and credible evidence, the search still could be upheld based on the doctrine of inevitable discovery. *State v. Foster*, 3d Dist. Allen No. 1-14-54, 2015-Ohio-3401, ¶ 9. Barnes's request to use the bathroom bore no connection to the entry into the residence by law enforcement. That is, even if law enforcement did not enter the residence, Barnes inevitably would have requested to use the facilities, and law enforcement, in the course of their independent investigation of Barnes, would have accompanied Barnes into the residence in order for him to use the facilities. Barnes would have consented to the presence of the police in his home so that he could do so. Barnes's hypothetical consent would have made law enforcement aware of the drugs in the vicinity of Cutarelli, as well as the drugs and weapons in the bathroom. That Barnes was in custody would not have rendered his hypothetical consent involuntary or coerced. *State v. Riggins*, 1st Dist. Hamilton No. C-030626, 2004-Ohio-4247, ¶ 18.

{¶30} For the reasons explained above, Barnes's first assignment of error is overruled.

## Assignment of Error No. II

**The Trial Court Erred When It Found That The Probation Officers Had Authority To Search [The Residence] Pursuant To The Written Consent Obtained Without Addressing Their Authority As Probation Officers.**

{¶31} In his second assignment of error, Barnes argues that the trial court erred when it found that the probation officers who aided in this search had the authority to do so under the consent form that was signed. Specifically, Barnes argues that probation officers are without such authority because R.C. 2301.28 does not provide probation officers authority to supervise individuals who are not on probation. Barnes further argues that R.C. 2951.02 outlines the searches that a probation officer in the scope of his or her duties may undertake and does not include searches such as the one at issue here. Barnes also argues that R.C. 2301.30 enumerates the duties of probation officers, and those duties do not include conduct that occurred in this case. Finally, Barnes argues that the consent form signed in this case allowed for the designation of other officers to conduct the search, but did not permit probation officers to be designated to do so—that the term "officers" applied to police officers but not probation officers.

{¶32} To the extent Barnes argues that the trial court failed to apply the proper statutes in this case, we review this assignment of error de novo. *State v. Hillman*, 10th Dist. Franklin Nos. 09AP-478, 09AP-479, and 09AP-480, 2010-Ohio-256, ¶ 11, citing *State v. Futrall*, 123 Ohio St.3d 498, 2009-Ohio-5590, ¶ 6-7

(noting that the proper standard of review is de novo where the issue is whether a court erroneously interpreted or applied the law). To the extent Barnes argues that Cutarelli's consent to the search extended only to police officers rather than probation officers, we are guided by the same standard of review we described above, asking whether the trial court's findings of fact as to the scope of Cutarelli's consent are based on competent and credible evidence. *State v. Brown*, 7th Dist. Columbiana No. 03CO49, 2004-Ohio-3364, ¶ 9-14.

**{¶33}** We conclude that Barnes's statutory arguments are unpersuasive. Barnes's statutory arguments turn on the fact that some of the individuals involved in this search were probation officers rather than police officers. This distinction is meaningless because "[p]robation officers have all the powers of regular police officers[.]" R.C. 2301.27. Though we may assume without finding that the probation officers who participated in this search did not derive the authority to do so from the specific statutes Barnes cites, the legislature has not evinced a more general intent to treat probation officers differently from police officers; in fact, it has done just the opposite. R.C. 2301.27.

**{¶34}** We are cognizant of the fact that the scope of a search based on consent is determined by the scope of the consent itself and that the requirement to procure a warrant is waived only to the extent granted by the consent. *State v. Brown*, 7th Dist. Columbiana No. 03CO49, 2004-Ohio-3364, ¶ 13, quoting *U.S. v. Dichiarinte*,

445 F.2d 126, 129 (7th Cir.1971). The United States Supreme Court has recognized that the proper inquiry for measuring the scope of consent is objective reasonableness—asking what a reasonable person would have understood based on the exchange between law enforcement and a suspect. *State v. Stepp*, 4th Dist. Scioto, No. 09CA3328, 2010-Ohio-3540, ¶ 28, citing *State v. Simmons*, 4th Dist. Highland No. 05CA4, 2006-Ohio-953, ¶ 29, citing *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801 (1991).

{¶35} Though Barnes argues incorrectly that applicable statutes treat probation officers differently from police officers, he cites no authority for the proposition that a consent form that allows "officers" to search a residence must refer only to police officers but not to probation officers. Nothing in the record before us indicates that a reasonable person would have understood Cutarelli's consent permitting officers to search the residence to be applicable to certain law enforcement officers but not to others.

{¶36} We therefore conclude that the trial court did not err in concluding that the probation officers who participated in this search had the authority to do so. Barnes's second assignment of error is overruled.

{¶37} Having found no error prejudicial to Appellant in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**