[Cite as *State v. Gregory*, 2019-Ohio-3000.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28240 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-3012 |
| | : | |
| MICHAEL GREGORY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of July, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

CHRISTOPHER C. GREEN, Atty. Reg. No. 0077072, 130 West Second Street, Suite 830, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** Defendant-Appellant, Michael Gregory, appeals from his conviction on one count of having weapons under disability in violation of R.C. 2923.13(A)(2), and one count of improper handling of a firearm in violation of R.C. 2923.16(B). Gregory contends that the trial court erred in overruling his motion to suppress evidence because the initial stop of the vehicle in which he was riding was unconstitutional. According to Gregory, the trial court erred in finding that the stop was lawful and in holding that subsequent facts, statements, or evidence to support the State's criminal action were derived from a lawful stop.

**{¶ 2}** We conclude that the trial court did not err in overruling Gregory's motion to suppress evidence. The facts precipitating an emergency dispatch justified a reasonable suspicion of criminal activity, and the tip to police was reliable. Furthermore, the stop of the van in which Gregory was riding was based on reasonable suspicion that the van was the one described by the caller reporting the emergency. Finally, because the stop was lawful, the exclusionary rule did not apply. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 3}** On August 1, 2018, at around 11:29 p.m., a woman called 911 to report that a drunken male was shooting a big handgun in the air for no reason. She described the individual as a black male wearing a khaki or tan-colored work outfit, and said he was a passenger in a big white work van. The caller stated that her location was at 1728 Harold Drive, and the van was parked at the time near the dead-end at the end of Harold Drive.

She also said that the incident occurred just before she called 911, and that when it took place, she was outside with a friend at 1728 Harold Drive. The caller refused to give her name, but her cell phone number was recorded and was included in the incident report. *See* State's Ex. 1 (recording of 911 call), and State's Ex. 2 (Incident Details Report).

{¶ 4} Two Dayton Police cruisers were dispatched to the scene. Officers Vincent Carter and Cody Hartings were in one cruiser, and Officer Mark Price was in the other. The cruisers were both marked and were equipped with video cameras, lights and sirens. In addition, the officers were all wearing the uniform of the day.

{¶ 5} Harold Drive is a dead-end street running north to south, and the only access to it is from the south via Stanford Place ("Stanford"), which runs east to west. Harold Drive is also the last street to the west that intersects with Stanford, and Stanford dead-ends right after the intersection with Harold Drive. Otterbein Avenue ("Otterbein") is the next street to the east from Harold Drive. Otterbein runs parallel to Harold Drive and also intersects with Stanford. Unlike Harold Drive, Otterbein does not dead-end on Stanford; instead, it continues to Cornell Avenue, which runs parallel to Stanford.

{¶ 6} To get to Harold Drive, the police drove down Cornell Avenue, and then turned onto Otterbein. They arrived around 11:39 p.m., about seven minutes after they were dispatched. *See* State's Ex. 2, p. 1. At that time, Price's cruiser was in the front; the other cruiser was a few seconds behind and was also on Otterbein. As Price turned onto Otterbein, he saw a white work van at the stop sign on Stanford. The van was facing east on Stanford (in other words, coming from Harold Drive), and was getting ready to turn right onto Otterbein to go south. Price did not notice any other vans in the area that matched the description the 911 caller had provided. Price went wide to make a U-

turn, which he could not quite complete. The white van went ahead and turned to go south on Otterbein.

{¶ 7} Officer Carter, who was driving the other cruiser, also saw the van. Officers Carter and Hartings also said they did not see any other white vans in the area. When Carter saw the van, he went head-on with the van and activated his cruiser lights. His cruiser ended up being hood-to-hood with the van. In the meantime, Price had backed up his cruiser, and he was behind the van with the cruiser lights activated.

{¶ 8} After exiting his cruiser, Carter drew his gun, which he held behind his hip and pointed downward. He then approached the passenger side of the van, since his cruiser was head-on with the van. As he approached, he could see three people in the van. Because the 911 caller had said that a passenger fired shots, Carter went straight to the rear passenger door. It was a sliding door. When Carter got to the door, he opened it and asked the individual in the back to step out. This individual (later identified as Gregory) was a black male wearing a tan pullover and tan work pants. The clothing matched the caller's description.

{¶ 9} Carter did not point his gun at Gregory, and he spoke in a calm, authoritative voice. His voice was not loud, nor was it argumentative. After Gregory got out of the van, Carter turned Gregory over to Price. Carter then used his duty flashlight to look into the van and observed a Hi-Point .40 caliber pistol in plain view. He noticed that the paint coloring on the gun was camouflage, which was unusual. At that point, Carter told Price to ask Gregory if the gun was real. Due to the nature of the call, there was more concern for officer safety if the gun were real as opposed to a BB gun. Gregory told Price that the gun was real.

{¶ 10} In the meantime, Officer Price had ordered Gregory to put his hands on his head. Price did not have his gun out. He then patted Gregory down to make sure he did not have any weapons on his person. During the patdown, Price discovered that Gregory had a loaded magazine stuffed into the right hip of his pants and had a holster on his belt. Price also smelled alcohol on Gregory.

{¶ 11} Gregory had been sitting alone in the back of the work van on a lawn chair, and the gun was found in the area where he had been sitting. The other two people in the van were a female, who was in the front passenger seat, and a male, who was in the driver's seat.

{¶ 12} After the patdown, Gregory voluntarily stated that he "was being honest" about the gun being real and that the gun was his. At that point, since the police had already found the gun, Price asked Gregory if he had a valid permit to carry a concealed weapon (CCW). Gregory responded that he did not have a CCW. Price then placed Gregory in the back of his cruiser. Gregory was not handcuffed at that time, but Price locked the cruiser so that no one could let Gregory out.

{¶ 13} Subsequently, Price talked with the female passenger and patted her down to make sure she was unarmed. After identifying her and checking for warrants, Price told her she was free to leave. When Price returned to the cruiser, Gregory said, "Excuse me sir," and then offered an explanation of why he had the gun. Gregory also stated that he knew he should not possess the gun, that he was fully responsible for the gun, and that he currently was under supervision. These statements were volunteered and were not in response to any questioning by Price.

{¶ 14} Eventually, while Gregory was still in the cruiser, Price did try to ask Gregory

questions. Specifically, Price wanted to ask Gregory about the firing of the gun. At that point, Price read Gregory his *Miranda* rights, and Gregory refused to answer any more questions. Price ultimately transported Gregory to the jail. Because the driver of the van had an outstanding warrant, he was also taken to the jail, and the van was towed.

{¶ 15} On August 2, 2018, the police filed two complaints in Dayton Municipal Court. One complaint alleged that Gregory had violated R.C. 2923.13(A)(2) by having a weapon while under disability, a third-degree felony. The other complaint alleged that Gregory had violated R.C. 2923.16(B) by improperly handling a firearm in a vehicle, a fourth-degree felony. Gregory was arraigned that day and asked for a preliminary hearing. Following a hearing on August 10, 2018, the court filed an entry finding probable cause for both charges.

{¶ 16} On August 31, 2018, the State filed an indictment in Montgomery County Common Pleas Court, charging Gregory with the same crimes that had been filed in Municipal Court. After pleading not guilty, Gregory filed a motion to suppress in September 2018, and a supplemental motion to suppress in early October 2018. The trial court then held an evidentiary hearing on October 12, 2018, at which time the court heard testimony from Officers Carter, Hartings, and Price.

{¶ 17} On November 8, 2018, the trial denied the motion to suppress. Thereafter, Gregory pled no contest to the crimes as charged, so that he could appeal the suppression decision. In December 2018, the court sentenced Gregory to 24 months for having a weapon under disability and to 18 months for improperly handling a firearm. The court imposed the sentences concurrently, while giving Gregory 120 days credit for time spent in confinement. This appeal followed.

II.  The Initial Stop

**{¶ 18}** Gregory's First Assignment of Error states as follows:

The Trial Court erred when it overruled the defendant's motion to suppress [and] when it held that the initial stop of the vehicle in which Mr. Gregory was a passenger was within Constitutional bounds.

**{¶ 19}** Under this assignment of error, Gregory contends that the trial court erred in finding that the 911 call was not purely anonymous and that the tip was sufficient to justify the stop of the vehicle.  In particular, Gregory focuses on the fact that the officers did not observe any illegal behavior and on their statements that the only reason they stopped the van was because it was in the vicinity of Harold Drive.

**{¶ 20}** "Appellate review of a motion to suppress presents a mixed question of law and fact.  When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses."  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.  "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard."  *Id.*

**{¶ 21}** Both the Fourteenth Amendment to the United States Constitution and Article I, Section 14, Ohio Constitution, protect persons from unreasonable searches and seizures.  *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 13. "Under the Fourth Amendment to the United States Constitution, a search conducted

without prior approval of a judge or magistrate is per se unreasonable, subject to certain well-established exceptions." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 181, citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 567 (1967). (Other citation omitted.)

{¶ 22} "One such exception was recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot...,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 372-373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), quoting *Terry* at 30. However, "where an officer making an investigative stop *relies solely upon a dispatch*, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis sic.) *Maumee v. Weisner*, 87 Ohio St.3d 295, 298, 720 N.E.2d 507 (1999).

{¶ 23} In general, the reasonableness of a search or seizure depends on the circumstances and facts of each case, and " 'is measured in objective terms by examining the totality of the circumstances.' " *Leak* at ¶ 13, quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Where the information the police possess before a stop "stems solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip. * * * The appropriate analysis, then, is whether the tip itself has sufficient indicia of reliability to justify the investigative stop. Factors considered ' "highly relevant in determining the value of [the informant's] report" ' are the informant's veracity, reliability, and basis of

knowledge." *Weisner* at 299, quoting *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

{¶ 24} While distinctions among categories of informants are "somewhat blurred, courts have generally identified three classes of informants: the anonymous informant, the known informant (someone from the criminal world who has provided previous reliable tips), and the identified citizen informant." *Id.* at 300. Typically, an anonymous informant is "comparatively unreliable," requiring "independent police corroboration," while "an identified citizen informant may be highly reliable and, therefore, a strong showing as to the other indicia of reliability may be unnecessary * * *." *Id.*

{¶ 25} In the case before us, the trial court concluded that the tip was not truly anonymous because the dispatcher had recorded the caller's cell phone number. The court also found the call reliable because the caller had first-hand knowledge, the incident was recent, and the caller gave the location where the shooting took place.

{¶ 26} According to Gregory, the mere fact that the police had the cell phone number of the informant does not transform the caller from an anonymous informant into a known citizen informant. As support for his position, Gregory relies on *State v. English*, 85 Ohio App.3d 471, 620 N.E.2d 125 (2d Dist.1993), and more specifically, *State v. Ramsey*, 10th Dist. Franklin No. 89AP-1298, 1990 WL 135867 (Sept. 20, 1990), which *English* discussed.

{¶ 27} In *English*, an unidentified woman called the police to report that the defendant was in a specific parking lot and had a gun on his person or in the glove box. The caller gave the police her address and asked that they not come to her home. She also said that the defendant and a confederate (who were in her view) were both dope

dealers and kept dope in their cars. In addition, the caller told the police that there was a gun in the defendant's car, that he owned two guns, that the cars had exited the lot, and that the defendant was in a particular car. *Id.* at 473. We concluded that the caller's information was sufficiently reliable to give the police justification to stop the defendant. *Id.* at 474. We agreed with the State's position that the caller's provision of her address added "reliability to her information because of a realization on her part that the police could find her if her information proved to be false." *Id.* at 473 and 475.

{¶ 28} During our discussion, we mentioned and distinguished *Ramsey*, which had dealt with a somewhat similar situation. *Id.* at 474. In *Ramsey*, the police received a tip about a possible drunk driver, and the caller described the license plate of the driver and the vehicle. The caller also left her name and phone number. *Ramsey* at *1. After locating the vehicle, the police followed it for about a quarter of a mile and observed no traffic violations. They stopped in front of the defendant's house, approached him as he exited his vehicle, and concluded from their observations that he was intoxicated. *Id.* The police then arrested the defendant for an OVI violation. *Id.*

{¶ 29} In *Ramsey*, the court noted that "leaving aside" the fact that the caller had identified herself, the tip's content provided "very little detail from which the reasonableness of the stop may be reviewed." *Id.* at *3. Specifically, the tip gave no basis for the caller's statements and provided nothing from which one could tell if the caller was honest or if the information was reliable. *Id.* the court then said that:

> The issue now clearly presented to this court is whether an otherwise insufficient tip such as this one is invested with sufficient indicia of reliability by the mere fact that the caller left her name and phone number. *Such a*

*tipster is often described as a citizen informant* because these tips have characteristics different from those provided by professional police informants or anonymous informants. The reliability of police informants is often established by their "track-record" with the police prior to the tip in question. As a citizen-informant may have never reported a crime before, this analysis is generally inapplicable. Citizen-informants also rarely have access to inside information about a suspect and usually simply report their observations. As a result, some courts have held that a citizen-informant who is the victim of or witness to a crime is presumed reliable. *Commonwealth v. Weidenmoyer* (P.A.1988), 539 A.2d 1291; *State v. Ege* (Neb.1988), 420 N.W.2d 305.

In each of these cases, however, the court required that the witness or victim relate the basis for their knowledge or observations. This is consistent with the totality of the circumstances approach as it satisfies the basis of knowledge factor. Given this information, the police can conclude that the caller is indeed a citizen-informant and thus have reason to believe that the caller is honest as well.

(Emphasis added.) *Ramsey*, 10th Dist. Franklin No. 89AP-1298, 1990 WL 135867, at *4.

**{¶ 30}** After making these comments, the court found that, because the tip was so meager, provision of the caller's name and phone number did not add significantly to the tip's reliability. *Id.* at *5. Among other things, "[u]nlike a crime scene report, the police did not talk to the citizen-informant personally, nor did they even know for certain that a

crime had been committed as is the case in the citizen-eyewitness cases." *Id.*

{¶ 31} In *English*, we noted that "[i]n this case, as in *Ramsey*, it might be said that the callers, having provided some personal information were thereby not totally anonymous." *English*, 85 Ohio App.3d at 474, 620 N.E.2d 125. This is the same comment that the trial court made in the case before us. *See* Doc. #26 at p. 7. Thus, like the callers in *English* and *Ramsey*, the caller here is more like a "citizen informant" than an anonymous caller.

{¶ 32} We found the tip reliable in *English* because the caller gave the police enough information to identify and locate her. In addition, the caller "expressed great concern about the police coming to her home and presumably thereby exposing her as an informant, and further exposing her to possible recrimination." *English* at 474.

{¶ 33} Applying these principles here, the police had the caller's cell phone number, which means that she was not truly anonymous. Moreover, unlike the callers in *English* and *Ramsey*, the caller actually observed a crime being committed and gave the police details about the crime and the participants. The trial court stressed that the recent nature of the event and the caller's "first-hand knowledge of the event militates in favor of reliability." Doc. #26 at p. 7. We agree.

{¶ 34} Furthermore, even if we assume that the tip was anonymous, it was still reliable, and the officers had reasonable suspicion to stop the van. In this regard, Gregory argues that the officers lacked reasonable suspicion because the only reason for stopping the van was that it was white and in the vicinity. Gregory notes that the officers did not observe any criminal activity or traffic violations. They also could not see an occupant in the van wearing the described clothes until after the van was stopped and

the door was opened.

{¶ 35} Some factors that significantly support the reliability of an anonymous tip include: "eyewitness knowledge"; a contemporaneous report"; the fact that an event is startling; and use of the 911 emergency system, which allows for tracing of calls. *Navarette v. California*, 572 U.S. 393, 399-401, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014). These factors are all present here.   As noted, the caller was an eyewitness to the shooing and called right after the incident happened.   Witnessing an individual shooting guns would obviously be a startling event.   And finally, the caller used the 911 system, which recorded her phone number.   In view of this technology, "a reasonable officer could conclude that a false tipster would think twice before using such a system."   *Id.* at 400.

{¶ 36} "Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.' "   *Id.* at 401, quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889.   Certainly, reports of gunfire from cars in residential neighborhoods indicate that criminal activity is afoot.   Furthermore, Gregory is simply incorrect when he asserts that the presence of the white van near the crime scene did not give rise to reasonable suspicion for a stop.   The call occurred at about 11:29 p.m. at night, and officers arrived in the area very quickly thereafter.   They observed a large white work van similar to the one that was described coming from the direction where the shooting had been reported.   Significantly, the street on which the van was traveling was the only means of exiting Harold Drive, and Stanford dead-ended shortly after Harold Drive, meaning that the van could have come only from Harold Drive.   Seeing two large white work vans coming from the same street at that time of night is theoretically possible, but extremely unlikely.   Thus, based on the totality of the

circumstances, the police reasonably suspected that the van contained the shooter, and they were entitled to stop the van to make an inquiry.

{¶ 37} Accordingly, the First Assignment of Error is overruled.

### III.    Subsequent Statements and Evidence

{¶ 38} Gregory's Second Assignment of Error states that:

The Trial Court erred in ruling that the initial stop of the vehicle was lawful and [that] subsequent facts, statements or evidence to support the State of Ohio's criminal action against Mr. Gregory were not derived from the initial unlawful stop.

{¶ 39} Under this assignment of error, Gregory contends that, because the initial stop was unlawful, any statements he made to the police or any evidence obtained thereafter should have been excluded.

{¶ 40} "The derivative-evidence rule, or fruit-of-the-poisonous-tree doctrine as it is widely known, requires suppression of evidence that was seized in a seemingly lawful manner but about which police learned because of a prior constitutional violation such as an illegal search or seizure."   *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, 968 N.E.2d 612, ¶ 20 (2d Dist.), citing *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). (Other citations omitted.)   The reason for excluding derivative evidence "is the concern that if derivative evidence were not suppressed, police would have an incentive to violate constitutional rights in order to secure admissible derivative evidence even though the primary evidence secured as a result of the constitutional violation would be inadmissible."   *State v. Carter*, 69 Ohio St.3d 57, 67, 630 N.E.2d 355

(1994).

{¶ 41} Because the initial stop was lawful, the exclusionary rule does not apply to evidence that was later discovered. Consequently, the Second Assignment of Error is overruled.

IV. Conclusion

{¶ 42} All of Gregory's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., dissents:

{¶ 43} I disagree. The United States Supreme Court in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301, described its decision as a "close case." *See also Navarette*, 572 U.S. 393, 399, 134 S.Ct. 1683, 188 L.Ed.2d 680. If that case was deemed close, this case presents too many unknowns to reasonably conclude that the tip was reliable enough to support a *Terry* stop. The Fourth Amendment "is not so easily satisfied." *Florida v. J.L.*, 529 U.S. 266, 273, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

{¶ 44} The Dayton police officers who stopped a "white work van" in the "general vicinity" of the shooting 3 to 5 minutes after dispatch knew nothing about the anonymous tipster on whose word – and that alone – Gregory was seized and the van searched. The police did not know the tipster's name, they did not know if she used her own phone to dial 911, and they did not know her residential address. An unnamed tipster "can lie with impunity." *J.L.* at 275 (Kennedy, J., concurring).

**{¶ 45}** I believe it is wrong to label and invent a novel theory characterizing the caller as a "citizen informant." Why do so? Because she reported "shots fired." *Terry* does not recognize a firearm exception despite an arguably justifiable sense of some urgency. *See generally State v. Davis,* 2d Dist. Montgomery No. 22775, 2009-Ohio-2538, ¶ 20 and *State v. Hauston,* Ohio Slip Opinion 2019-Ohio-1622, __N.E.3d__ (distinguishable in that the police themselves heard the gunshots).

**{¶ 46}** An all's-well-that-ends-well approach, one that excuses an unconstitutional seizure and immediate search because it turns up some illegal activity, violates bedrock Fourth Amendment principles. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (noting Court has "consistently rejected" proposition "that a search unlawful at its inception may be validated by what turns up").

**{¶ 47}** I would reverse.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Christopher C. Green
Hon. Mary Lynn Wiseman