[Cite as *State v. Rutherford*, 2020-Ohio-1309.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28486 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-2924 |
| | : | |
| SHEILA MARIE RUTHERFORD | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of April, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ANDREA DEWAR OLADI, Atty. Reg. No. 0078868, 117 South Main Street, Suite 400, Dayton, Ohio 45422
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-Appellant, Sheila Marie Rutherford, appeals from her conviction on charges of aggravated possession of drugs and possessing drug abuse instruments. According to Rutherford, the trial court erred in overruling her motion to suppress evidence because the initial stop of her vehicle was unconstitutional.

**{¶ 2}** After reviewing the record, we conclude that the trial court did not err in overruling Rutherford's motion to suppress evidence. The facts precipitating an emergency dispatch justified a reasonable suspicion of criminal activity, and the tip to the police was reliable. Furthermore, the stop of Rutherford's car was based on reasonable suspicion that the car was the one described by the caller who had reported the emergency.

## I. Facts and Course of proceedings

**{¶ 3}** Rutherford was indicted on September 19, 2018. On March 18, 2019, she moved to suppress evidence recovered from the traffic stop involved in this case. The trial court held an evidentiary hearing on May 3, 2019, during which Rutherford challenged only the "lawfulness of the initial stop of the vehicle based off an anonymous tip." Transcript of Proceedings ("Tr."), p. 4. On May 23, 2019, the court overruled the motion to suppress.

**{¶ 4}** On July 22, 2019, Rutherford entered a plea of no contest on both counts of the indictment, and the trial court found her guilty. The court sentenced Rutherford to serve community control sanctions. On July 30, 2019, Rutherford filed a timely notice of appeal challenging the trial court's order overruling the motion to suppress evidence.

**{¶ 5}** During the suppression hearing, the following evidence was elicited. Huber

Heights Police Officer Mike Winterbotham testified that he received a 911 center dispatch on June 25, 2018, at approximately 1:30 p.m. According to the information received and recorded from dispatch, a Burger King customer reported to the 911 center that a woman was "shooting up and out of it" in a vehicle parked in the business's parking lot. Dispatch log, State's Ex. 2, p. 3. Winterbotham testified that he believed the information he received was that the woman was "shooting up." Because Winterbotham was in close proximity, he immediately responded.

{¶ 6} Winterbotham had been informed that the caller was a female who wished to remain anonymous. The dispatch center recorded the caller's phone number. Tr. at p. 2. Later that day, Winterbotham obtained the witness's identity from the dispatcher in order to learn more about her observations in the parking lot. The comments received by 911 dispatch and relayed to Winterbotham were also recorded and admitted as an exhibit at the hearing. Id. at p. 16-18, and 30; Dispatch log, State's Ex. 2 at p. 3-4.

{¶ 7} At the time of this incident, Winterbotham had served as a police officer for about five and a half years and had investigated several hundred incidents concerning the illegal use and/or possession of illegal narcotics. Winterbotham explained that based on his training and experience, "shooting up" is commonly associated with using a hypodermic needle to inject narcotics into one's arm. Tr. at p. 10.

{¶ 8} The caller described the person involved as a white woman who was the sole occupant of the vehicle. The woman was further described as having red hair and a cast or brace on her arm. In addition, the car was described as a silver Dodge Avenger with a specific license number. Tr. at p. 11 and 21.

{¶ 9} While Winterbotham responded to the dispatch, the dispatch center

continued to relay updates about the vehicle's location as they were received from the caller. A few moments after receiving the dispatch, Winterbotham approached the Burger King and located the silver Dodge Charger as it moved northbound on Old Troy Pike. Tr. at p. 13. Winterbotham then pulled his vehicle behind the Dodge Charger and activated his overhead emergency lights to conduct a traffic stop on Old Troy Pike. In response, the vehicle turned into a McDonalds' restaurant parking lot at the corner of Old Troy Pike and Merily Way, and stopped. This location was less than one-quarter of a mile from the Burger King. *Id.* at p. 14-15.

{¶ 10} According to Winterbotham, the stop was based on the amount of detail provided from dispatch and the public safety issue that the female could be driving under the influence of narcotics. *Id.* at p. 15. As Winterbotham walked toward the car, he observed that Rutherford matched the description given by the witness, in that she was the sole occupant, was a white female with red hair, and had a brace on her arm. *Id.* at p. 15-16, and 23. After the stop, contraband was recovered from the vehicle. *Id.* at p. 15. Rutherford was then arrested and charged as indicated above.

## II. Legality of the Stop

{¶ 11} Rutherford's sole assignment of error states as follows:

The Lower Court Erred When It Denied Ms. Rutherford's Motion to Suppress and Found Lawful the Stop of Ms. Rutherford's vehicle based solely on the Allegations of An Annonymous [sic] 911 Caller.

{¶ 12} Under this assignment of error, Rutherford contends that the trial court erred in finding that the 911 call was not purely anonymous and that the tip was sufficient to

justify the stop of the vehicle. To support her position, Rutherford argues that: (1) no evidence of unlawful conduct existed to justify the stop; (2) the anonymous 911 call lacked the required reliability necessary for a lawful stop; and (3) before stopping the vehicle, the officer failed to establish the driver's identity to see whether it matched the descriptors provided by the anonymous caller. For the reasons discussed below, we find no merit in these arguments.

{¶ 13} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶ 14} Both the Fourteenth Amendment to the United States Constitution and Article I, Section 14, Ohio Constitution, protect persons from unreasonable searches and seizures. *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 13. "Under the Fourth Amendment to the United States Constitution, a search conducted without prior approval of a judge or magistrate is per se unreasonable, subject to certain well-established exceptions." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 181, citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 567 (1967). (Other citation omitted.)

{¶ 15} "One such exception was recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct.

1868, 20 L.Ed.2d 889 (1968), which held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . ,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 372-373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), quoting *Terry* at 30. However, "where an officer making an investigative stop *relies solely upon a dispatch*, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis sic.) *Maumee v. Weisner*, 87 Ohio St.3d 295, 298, 720 N.E.2d 507 (1999).

{¶ 16} In general, the reasonableness of a search or seizure depends on the circumstances and facts of each case, and " 'is measured in objective terms by examining the totality of the circumstances.' " *Leak* at ¶ 13, quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Where the information the police possess before a stop "stems solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip. * * * The appropriate analysis, then, is whether the tip itself has sufficient indicia of reliability to justify the investigative stop. Factors considered ' "highly relevant in determining the value of [the informant's] report" ' are the informant's veracity, reliability, and basis of knowledge." *Weisner* at 299, quoting *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

{¶ 17} "While distinctions among categories of informants are 'somewhat blurred, courts have generally identified three classes of informants: the anonymous informant, the known informant (someone from the criminal world who has provided previous reliable

tips), and the identified citizen informant.' " *State v. Gregory*, 2d Dist. Montgomery No. 28240, 2019-Ohio-3000, ¶ 24, quoting *Weisner* at 300. "Typically, an anonymous informant is 'comparatively unreliable,' requiring 'independent police corroboration,' while 'an identified citizen informant may be highly reliable and, therefore, a strong showing as to the other indicia of reliability may be unnecessary * * *.' " *Id.*

{¶ 18} A tipster who leaves a name and phone number " '*is often described as a citizen informant* because these tips have characteristics different from those provided by professional police informants or anonymous informants. The reliability of police informants is often established by their "track-record" with the police prior to the tip in question. As a citizen-informant may have never reported a crime before, this analysis is generally inapplicable. Citizen-informants also rarely have access to inside information about a suspect and usually simply report their observations.' " (Emphasis sic.) *Id.* at ¶ 29, quoting *State v. Ramsey*, 10th Dist. Franklin No. 89AP-1298, 1990 WL 135867, *4 (Sept. 20, 1990).

{¶ 19} "Some factors that significantly support the reliability of an anonymous tip include: 'eyewitness knowledge'; a 'contemporaneous report'; the fact that an event is startling; and use of the 911 emergency system, which allows for tracing of calls." *Id.* at ¶ 35, quoting *Navarette v. California*, 572 U.S. 393, 399-401, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014).

{¶ 20} Here, the factors all support reliability. As noted, the caller was an eyewitness to Rutherford "shooting up" in the described vehicle while in a fast food parking lot and called contemporaneously as the incident happened. Moreover, witnessing an individual "shooting up" in these circumstances would be a startling event.

And finally, the caller expressed a desire to be anonymous to the officers responding, but provided her contact information to the dispatch center. She also used the 911 system, which recorded her phone number. In light of this technology, "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Navarette* at 400.

{¶ 21} In the case before us, the trial court relied in part on *Navarette,* in finding that the tip's detail contained sufficient indicia of reliability to justify the stop. Applying these principles, the court found the 911 call reliable because the caller had first-hand knowledge, the incident was recent, and the caller gave the original location and updated information where Rutherford and the vehicle were located. We agree.

{¶ 22} We have also applied the *Navarette* factors in similar cases and found the tips sufficiently reliable to justify the stops. *See State v. Smith*, 2d Dist. Greene No. 2019-CA-5, 2019-Ohio-4370, ¶ 28 (a private citizen who called police and gave identifying information described a van, its location, and direction weaving on the road, with the driver nodding off and a passenger unconscious); *State v. Cook,* 2d Dist. Clark No. 2019-CA-28, 2019-Ohio-3918, ¶ 2 and 13 (unidentified, panicked witness in an adjacent car told a deputy sheriff that a guy in a white car behind the deputy was waving a gun); *Gregory*, 2d Dist. Montgomery No 28240, 2019-Ohio-3000, at ¶ 33 (anonymous woman called 911, which recorded her cell phone number. The caller gave her address but refused to give her name, and reported a drunken man (whom she described in detail), shooting a big gun at the dead-end of her street); *State v. Pickett*, 2017-Ohio-5830, 94 N.E.3d 1046, ¶ 2 and 15 (2d Dist.) (tipster who called 911 was classified an identified citizen informant and was sufficiently reliable because he disclosed his first name and cellular telephone

number, witnessed the event, and provided details regarding the offense).

{¶ 23} Although Winterbotham testified that he made the stop because he believed the woman described was "shooting up," rather than what was reflected in the 911 dispatch record, i.e., that the woman was "shooting up and out of it," the dispatch record must be considered under the collective knowledge doctrine. Under this doctrine, the knowledge of law enforcement officers is imputed to other officers. Thus, the admissibility of the evidence discovered during a stop based solely on a dispatch does not rest upon whether the officers relying upon a dispatch were themselves aware of specific facts justifying their actions. Rather, admissibility turns upon whether the information that precipitated the dispatch justified a reasonable suspicion of criminal activity. *State v. Johnson*, 10th Dist. Franklin No.16AP-689, 2017-Ohio-5527, ¶ 21-24.

{¶ 24} Again, we agree with the trial court for the following reasons. First, the female caller stated that she witnessed a woman in the vehicle "shooting up and out of it" in the described car in a fast food parking lot. The caller also described the female in the car in great detail as the sole occupant, as a white female with red hair, and as having a cast or brace on her arm. In addition, the caller provided the specific make, model, color, and license plate number of the car. She further gave the dispatcher an intermittent, real-time account of the whereabouts of Rutherford's vehicle during the time that Winterbotham responded. The police response time was also short, and Rutherford's vehicle was observed in the immediate area as described. Finally, the caller was not truly anonymous because either the dispatcher or the 911 system recorded the caller's phone number which is recorded in the dispatch log. This allowed Officer Winterbotham to contact the caller later in the day after Rutherford had been stopped.

{¶ 25} Nonetheless, as indicated above, sufficient indicia of reliability of the tip, including the tipster's classification as a citizen informant, is not the end of the analysis. In this vein, we have held that:

> Irrespective of the informant's status, when the police execute an investigative stop based exclusively on an informant's tip, the stop's legality is determined by an assessment of the informant's reliability and, assuming the tip's reliability, whether the tip established a reasonable, articulable suspicion that the person to be stopped was, or was about to be, engaged in criminal activity.

(Citations omitted.) *Cook*, 2d Dist. Clark No. 2019-CA-28, 2019-Ohio-3918, at ¶ 9.

{¶ 26} Stated differently, "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.' " *Navarette*, 572 U.S. at 401, 134 S.Ct. 1683, 188 L.Ed.2d 680, quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 27} Because the officer making the investigative stop of Rutherford relied only on a dispatch, the State " 'must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity.' " *Smith*, 2d Dist. Greene No. 2019-CA-5, 2019-Ohio-4370, at ¶ 22, quoting *Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507, at paragraph one of the syllabus.

{¶ 28} According to Rutherford, self-injecting prescribed medication in the manner described by the witness in the tip is not illegal, and the officer witnessed no erratic driving or traffic violations. Tr. at p. 24 and 25. Although this may be true, we find under the circumstances that Winterbotham had a reasonable, articulable suspicion that Rutherford

had been "shooting up" narcotics shortly before he observed her operating the motor vehicle.   Winterbotham was entitled to rely on his training and experience to interpret the information that he was given.   From his training and experience as a law enforcement officer, "shooting up" commonly refers to injecting narcotics.   *Id.* at p. 10.   Furthermore, Winterbotham considered public safety in his decision to stop the Dodge Charger.   *Id.* at p. 15-16.   As a result, under the circumstances of this case, the State satisfied its burden.

{¶ 29} Finally, Rutherford argues that the stop was unlawful because Winterbotham did not identify her as a person matching the description provided by the tip before he stopped the Dodge Charger.   In this regard, Winterbotham testified that he could only see the silhouette of one person, the driver, in the vehicle before stopping it. *Id.* at p. 25.   He further said he did not personally observe that Rutherford matched the description in the tip until he walked up to the car.   *Id.* at p. 23.

{¶ 30} Nonetheless, we find that the fact Rutherford was driving the identified vehicle shortly after the caller described the events and the fact of her sole occupancy provided reasonable, articulable suspicion that the driver and sole occupant of the vehicle was the same person who had been seen "shooting up" when the vehicle was parked.

{¶ 31} Thus, based on the totality of the circumstances, Winterbotham reasonably suspected that the vehicle contained the person who had been "shooting up" and was then operating a motor vehicle on a busy street.   Winterbotham, therefore, was entitled to stop the car to make an inquiry.

{¶ 32} Based on the preceding discussion, we conclude that the investigative stop was lawful under the circumstances of this case.   The tip contained sufficient indicia of reliability from an identified citizen informant that provided the officer with reasonable,

articulable suspicion that criminal activity may have been afoot, and Rutherford, as the driver of the car, was the person the witness had described.

{¶ 33} Accordingly, Rutherford's sole assignment of error is overruled.

## III. Conclusion

{¶ 34} Rutherford's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Andrea Dewar Oladi
Hon. Timothy N. O'Connell
.